**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**UNITED STATES OF AMERICA**

        **Plaintiff,**                                  Case No. CR2-07-124 (5)
                                                             JUDGE GREGORY L. FROST

    **v.**

**JESUS MANUEL VALETA**

        **Defendant**

**ORDER**

This matter came on for a hearing the 9th day of June, 2008 upon Defendant's Motion to Suppress Evidence (Doc. # 134) filed on May 19, 2008 and upon the Government's Response (Doc. # 138) filed on June 4, 2008.  Defendant requests that the Court suppress all physical evidence seized by law enforcement officers on September 20, 2007 from the residence located at 2211 N. 94th Avenue, Phoenix, Arizona.  Defendant also requests that any post-arrest statements made by Defendant be suppressed.  The Government opposes the motion and argues that all of the evidence seized and the statements made by Defendant were legally seized and obtained and should not be suppressed.

    **I. Standing**

At the hearing, the Government raised the issue of Defendant's standing to contest the search of the premises.  Counsel for Defendant indicated that Defendant would present evidence that Defendant lived, at least part-time, at the residence with his girlfriend and his three children and that he had stayed at the residence the night before the officers raided the residence.  As indicia of the fact that Defendant resided at the residence and therefore has standing to raise the Fourth Amendment issues, Defendant points to the facts that his clothes, checkbook, keys, and

driver's license were all found in the residence and that his girlfriend will indicate that Defendant resided there with her and their three children.

Based upon those representations, the Court found, at least initially, that Defendant had standing to raise the Fourth Amendment issues concerning the seizure of items from the residence. The Government proceeded with the presentation of three witnesses and Defendant called one witness to testify. Testimony of the witnesses confirmed the representations of defense counsel. The Court finds that Defendant has standing to contest the seizure of evidence from the residence. Although Defendant may have had dual residences, for the purposes of this case the Court finds Defendant had a reasonable expectation of privacy in the residence located at 2211 N. 94th Avenue, Phoenix, Arizona. Defendant's clothes, personal effects, checkbook, and identification were at the residence. According to Miriam Chavez and uncontradicted by the Government's witnesses, Defendant stayed at the residence 80% - 90% of the time. His girlfriend lived there with his three children. The facts presented support that Defendant had an expectation of privacy in the residence and therefore has standing to contest the search and seizure. *Miranda v. Olson*, 495 U.S. 91, 98-99 (1990); *U.S. v. Ponder*, 240 Fed. Appx. 17 (6th Cir. 2007).

## II. Facts

At the June 9, 2008 hearing, Deputy U.S. Marshal Erick Brown, A.T.F. Special Agent Kirk Howard, and Columbus Police Detective Paul Siniff all testified on behalf of the Government. Miriam Chavez testified on behalf of Defendant. Because of credibility issues involving Miriam Chavez, which this Court will discuss later, the Court finds the facts to be essentially as testified to by the law enforcement officers.

Deputy Marshal Erick Brown was assigned to a Fugitive Task Force in the Phoenix, Arizona area. On September 20, 2007 he and the Task Force were assisting Columbus, Ohio law enforcement officers who were in the Phoenix area attempting to locate Defendant. A warrant had been issued for the arrest of Defendant on the Indictment which is the subject of this matter. The officers identified the residence at 2211 N. 94th Avenue, Phoenix, Arizona as the probable residence of Defendant, his girlfriend, and his three children. Surveillance was initiated at approximately 9:00 a.m. on the morning of September 20, 2007. There were approximately ten law enforcement officers with various agencies assigned to the surveillance. The location of the subject's residence on a cul-de-sac made it difficult for the officers to watch without raising suspicion.

An unknown female left the residence and law enforcement agents followed her while others remained in the vicinity of the residence. The unknown female who left the residence in an automobile was eventually stopped and questioned. Because the officers believed that the female who was stopped and questioned was deceptive with the officers, it was decided to approach the house to attempt to locate Defendant. Several officers approached the house and many but not all of the officers had weapons drawn or visible. All of the officers were dressed in tactical gear marked to identify them as law enforcement agents.

Deputy Marshal Brown approached the front door and knocked. He was armed but his weapon what not drawn. An unknown Hispanic female answered the door. Deputy Marshal Brown advised the unknown female that they had a warrant for the arrest of the Defendant. The female was very uncooperative and was hesitant to give the officers any information. She eventually indicated that she knew Defendant but indicated Defendant was not there.

Marshal Brown requested that Miriam Chavez come to the front door. The female yelled for Ms. Chavez and Marshal Brown also yelled for her. Ms. Chavez came to the door. Again, the officer explained that they had a warrant for the arrest of Defendant and that they were looking for him. Ms. Chavez indicated that she was his girlfriend but she had not seen Defendant for some time. She admitted that Defendant did reside at the house. The officer explained to Ms. Chavez that if she were harboring a fugitive, she could be charged with a crime.

During the encounter with Ms. Chavez, Deputy Marshal Brown testified that she said three or four times that Defendant was not in the house and the officers could go in the house and look. The officers did not go inside the residence immediately. Rather, they called for everyone in the house to come out. Ms. Chavez went in the house by herself to get the children. Thereafter, members of the Task Force entered the residence in an attempt to locate Defendant. No one was located inside the residence. While searching for Defendant in the upstairs master bedroom, the officers entered the walk-in closet and observed assault-type rifles. While the search of the residence was progressing, a vehicle drove into the cul-de-sac area, aggressively turned around, and fled the neighborhood.

When questioned on cross examination, Deputy Marshal Brown admitted that he did not advise Ms. Chavez that she had the right to refuse the official's request and Ms. Chavez was not read any *Miranda* rights. He maintained his previous testimony that Ms. Chavez gave him permission at least three times to enter the residence.

Special Agent Kirk Howard with A.T.F. was assigned to the Columbus, Ohio office but was in Phoenix, Arizona attempting to locate Defendant. On September 20, 2007 he was on surveillance in the neighborhood of the house that had been identified as Defendant's residence.

When the unknown female left the residence, Agent Howard and at least one other officer followed her. The female drove to the eastside of Phoenix and stopped at a business. As she exited her vehicle the officers approached and identified themselves. The female identified herself as a sister of Defendant. The officers asked her about her brother and she denied seeing him for at least one week. Ms. Valeta denied that she had left the residence but when confronted with the fact that they had followed her from there, she admitted that she had left there that morning to go to her place of employment.

Agent Howard was advised via radio that consent to enter the residence had been obtained from Ms. Chavez. Agent Howard returned to the house. He was directed to the weapons in the closet and then he spoke with Ms. Chavez who was then in the house. Agent Howard testified that Ms. Chavez was cooperative with him. She advised Agent Howard that Defendant had brought the guns into the house. Agent Howard asked Ms. Chavez for her consent to search the residence and she signed a written consent form permitting the officers to search the premises. The form advised Ms. Chavez that she had the right to refuse if she chose to do so. Agent Howard testified that Ms. Chavez was never placed under arrest, that she apparently understood the officers when they asked her questions, and that she was not coerced into signing the forms.

Fourteen guns were removed from the residence. During the confiscation of the weapons, a hand grenade was located. As a result of that discovery, the bomb squad and a drug-detecting dog were summoned. The hand grenade was removed from the premises and then the dog alerted to a dresser in the master bedroom. A considerable amount of cash was removed from a hidden compartment in the dresser. Ms. Chavez was permitted to retain money that was

5

found in an envelope in a nightstand that she claimed was hers.

It is unclear from the testimony how Defendant was eventually taken into custody. Regardless, Detective Paul Siniff of the Columbus Police Department who had been assigned to the Task Force met with Defendant at a Phoenix Police Department substation after Defendant had been arrested. Defendant was read his *Miranda* rights and Defendant signed a waiver of those rights. Defendant indicated to Detective Siniff that he understood his rights and desired to waive the *Miranda* rights. Defendant agreed to talk with the officer and a statement was taken from Defendant.

The Government rested and Defendant called his only witness, Miriam Chavez. Ms. Chavez testified that she was intimidated into giving consent to search the residence. She indicated that she was forced to give consent because the officers threatened to arrest her if she did not give consent. This Court finds Ms. Chavez's testimony wholly incredible. On cross-examination the witness identified an identification card found in the residence. The identification card had a photograph of Ms. Chavez but it was issued to a "Carolina Tardo." Ms. Chavez explained that the false identification card had been obtained for her by a relative in Mexico. She said that she sent a photo to Mexico and the relative obtained the false identification. Ms. Chavez was not entirely clear why she had the fake identification. Apparently the lease of the premises searched was in the false name of Carolina Tardo. When pressed, Ms. Chavez indicated that she was trying to separate herself from Defendant and that is why she had the false identification and that was the reason for the lease of the premises being in the false name. This testimony was contradicted by Ms. Chavez's own testimony that Defendant resided with her 80% - 90% of the time at that residence. Given the relationship of Ms. Chavez

6

with Defendant and the incredible testimony about the false identification, this Court finds the testimony of Ms. Chavez to be unbelievable.

### III. Analysis

Defendant's requests that the Court suppress all physical evidence seized by law enforcement officers from 2211 N. 94th Avenue, Phoenix, Arizona on September 20, 2008 and all post-arrest statements made by him are not well taken.

With regard to Defendant's request to suppress the physical evidence taken from Ms. Chavez's house, the government bears the burden of proving that Ms. Chavez's consent was voluntarily and intelligently given and was not the product of coercion or duress. *United States v. Riascos-Suarez*, 73 F.3d 616, 625 (6th Cir. 1996). The voluntariness of a consent to search is a question of fact to be determined by the trial court. *United States v. Rose*, 889 F.2d 1490 (6th Cir. 1989). While the right to refuse consent is a factor to be taken into account, knowledge of the right to refuse is not a prerequisite to establish that the consent was voluntarily given. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973).

Any individual with a reasonable expectation of privacy in the place to be searched may consent to a warrantless search. Therefore, any person with common authority over the place to be searched can give a valid consent. *United States v. Matlock*, 415 U.S. 164, 171 (n.7) (1974). The Sixth Circuit has held that any joint occupant of a residence may consent to its search. *United States v. Moore*, 917 F.2d 215 (6th Cir. 1990). All residents or occupants can be bound by the consent of any one of the co-residents. *United States v. Reeves*, 594 F.2d 536 (6th Cir. 1979). The Sixth Circuit has also held that:

> [a] search does not violate the Fourth Amendment where police obtain consent to search from one who possesses common authority over the premises with the

absent non-consenting target of the search.

*United States v. Clutter*, 914 F.2d 775, 777 (6th Cir. 1990).

Here, Ms. Chavez offered on several occasions to let the officers look in her house for Defendant. During the search weapons were found in plain view and she subsequently signed an open ended consent to search the premises. At no time did Ms. Chavez revoke her consent.

The Court finds that Ms. Chavez possessed authority to give consent to search 2211 N. 94th Avenue, Phoenix, Arizona and that she voluntarily and intelligently gave such consent when she offered to let the officers look in her house and when she signed an open ended consent. The Court further finds that Ms. Chavez's consent was not a product of coercion or duress. The fact that Ms. Chavez was not verbally informed that she had the right to refuse consent does not change this Court's findings. *See Schneckloth*, 412 U.S. at 227. Accordingly, the Court will not suppress the evidence found at Ms. Chavez's house on September 20, 2007.

With regard to the post-arrest statements made by Defendant, those too will not be suppressed. The Court finds that Detective Paul Siniff of the Columbus Police Department met with Defendant at a Phoenix Police Department substation after Defendant had been arrested and read Defendant his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436 (1966). At that time, Defendant indicated to Detective Siniff that he understood his rights and desired to waive the *Miranda* rights. Defendant agreed to talk with the officer and a statement was taken from Defendant.

Consequently, there is no basis upon which to suppress Defendant's statements.

**IV. Conclusion**

Based on the foregoing, the Court **DENIES** Defendant's Motion to Suppress Evidence. (Doc. # 134)

    **IT IS SO ORDERED.**

                                               **/s/   Gregory L. Frost**
                                               Gregory L. Frost
                                               United States District Judge